[No. 1370.]

ANDREW J. WALKER *v.* THE STATE.

1. REASONABLE DOUBT—CHARGE OF THE COURT.—See statement of the case for an instruction upon the subject of reasonable doubt requested by the defendant, and *held* properly refused, under decisions of this court referred to in the opinion.

2. CHARGE OF THE COURT—EVIDENCE—PRACTICE.—A charge of the court which is, in effect, a philosophic disquisition upon the force and nature of a particular species of evidence, amounts to an invasion of the province of the jury, and is error. See the statement of the case for such a charge requested, and *held* properly refused. And see the same for evidence held admissible not only as dying declarations, but also as *res gestæ,* and entitled to consideration as such.

3. PRACTICE—VERDICT.—It is the duty of the trial court to refuse to receive a verdict which is manifestly informal and insufficient, and to call the attention of the jury to its defects, and to direct them as to its correction.

4. SAME.—Trial courts are authorized to receive verdicts on Sunday.

5. SAME.—Incorrect orthography or ungrammatical language will not vitiate a verdict.

6. SAME—IDEM SONANS.—In applying the doctrine of *idem sonans* the rule is that if the words may be sounded alike, without doing violence to the power of the letters found in the variant orthography, then the words are *idem sonans,* and the variance is immaterial. *Held,* that, under this rule the words "mrder" and "murder" are *idem sonans.*

7. SAME.—The doctrine of *idem sonans* applies to and governs verdicts in the same manner and to the same extent that it does in other matters.

8. VERDICTS are to have a reasonable intendment and to receive a reasonable construction, and are not to be avoided unless from necessity originating` in doubt of their import, or immateriality of the issue found, or their manifest tendency to work injustice, or their failure to contain that which some express provision of statute requires they should contain. The verdict in this case reads; "Wee the jurors finde the defendant gilty and of murder in the first degree, and assess his confinement in the penitentiary for life." *Held*, sufficient under the rule annou:-ced, and not obnoxious to the objection that it fails to assess the punishment according to law.

9. PRACTICE—CONTINUANCE.—See the opinion *in extenso* for absent testimony set out in an application for a first continuance, *held* immaterial, wherefore the trial court did not err in refusing the application because of such absent testimony.

10. SAME.—If substantially the same testimony as that which is absent has been produced on the trial, a defendant cannot be heard to complain of the action of the court in refusing a continuance because of such absent testimony.

11. PRACTICE—EVIDENCE.—Declarations or acts of a defendant in his own favor, unless part of the *res gestœ*, or part of a confession introduced against him, are not admissible for the defense. Under this rule it would have been incompetent for the defendant to prove by the sheriff that he, defendant, telegraphed him to come and arrest him, defendant, and that, when the sheriff did come, the defendant surrendered voluntarily.

12. SAME—CONTINUANCE—DILIGENCE.—Because the State failed to controvert the allegations of an application for continuance at the time it was presented, as to the question of diligence, it was not debarred from so doing on the motion for new trial, when the refusal of the application for continuance was made one of the grounds for new trial.

13. SAME—See the opinion *in extenso* for a showing of diligence set out in an application for continuance *held* insufficient.

14. SAME—PRACTICE IN THIS COURT.—In any view of the question of diligence, notwithstanding a defendant is not required to state in his first application for a continuance that he cannot produce the desired testimony from any other source, this court cannot hold that he has been injured by the refusal of the continuance, when, as in this case, it is made to appear that he had present on the trial, and could have produced, the same testimony from other sources, and elected not to do so.

15. CONTINUANCE should not be granted because of the absence of leading counsel for the defense, when it appears that the defendant was faithfully represented by other counsel, and does not appear to have been prejudiced

ON REHEARING.

16. CONTINUANCE.—A witness is understood to disobey a subpœna or an attachment when he is not in attendance upon the court on the day set apart for the taking up the criminal docket, or any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness.

17. SAME—DILIGENCE.—Where, at a previous term of the trial court, a witness for the defense failed to appear, though under bond, it was the right of the defendant to demand a forfeiture of the bond, and an *alias* attachment, and a failure in this respect shows insufficient, diligence to support a subsequent application for a continuance.

18. PRACTICE—FORFEITURE OF APPEARANCE BOND.—While it is the right, it is not the duty of the State to demand the forfeiture of the appearance bond of a defaulting witness.

19. SAME—CONTINUANCE—BURDEN OF PROOF.—The *onus* is upon the defendant to establish the exercise of diligence to support an application for a continuance, and the State cannot be held to show a want of diligence in opposition to a continuance. The rule is, in *brief*, that the burden is upon the party seeking a continuance to show himself entitled to it by definite, exact and certain averments.

20. SAME.—See, *in extenso*, the opinion on rehearing elaborating the original opinion upon the question of continuance.

APPEAL from the District Court of Liberty.    Tried below before the Hon. E. Hobby.

This is the conclusion of the long series of trials of the appellant for the murder of Green Butler, in Galveston county, on the nineteenth day of May, 1872.  For the reports of former trials on appeal see 37 Texas, 368; 42 Texas, 360; Id., 377; 1 Texas Court of Appeals, 368; 3 Texas Court of Appeals, 668.  On this trial he was convicted of murder in the first degree, and was awarded a life term in the penitentiary as punishment.

The requested charge refused by the court, and referred to in the first of these head-notes, reads as follows:

"The defendant, by his counsel, requests the court to charge the jury that he is presumed to be innocent until his guilt is established by the evidence to the satisfaction of the jury beyond a reasonable doubt.  By reasonable doubt is meant that if, after weighing and considering all the testimony, it fails to satisfy the minds of the jury that the defendant is guilty as charged; that it does not exclude every other hypothesis than that of the guilt of the defendant, then it is the duty of the jury to find the defendant not guilty."

The requested charge refused, and referred to in the second of these head-notes, reads as follows:

" The defendant, by his counsel, requests the court to charge the jury that, whilst it is true that 'dying declarations,' made with knowledge or belief that death is impending, are receivable in testimony, yet they are not to be regarded as entitled to

greater belief because made by one who knows that he is near death; but all the circumstances under which he received his belief of facts stated by him in regard to the person who killed him, and the manner of killing, should be regarded by the jury. So far as they are shown by the testimony and from those circumstances, the jury may determine what, if any, credit should be given to such dying declarations."

The testimony involved in the ruling of this court announced in the first of these head-notes follows first in order in this statement of the case.

Mrs. Annie Butler, the wife of the deceased, who testified on the first trial of this case, was shown by the State to have since died, and her testimony on the first trial was shown to have been in substance as follows:

Late on the evening of May 19, 1872, the witness and her husband, the deceased, sat at their supper table, at their home on Clear creek, in Galveston county, Texas. The deceased, rising presently, walked out of the room to the gallery and was hailed by some one, and the witness heard him respond: "Certainly, sir; alight and come in." A pistol shot followed. The witness ran out, and saw two men riding off, and found her husband lying on the ground. She asked him: "My God! are you dead?" and he replied: "Yes, Annie, I am dead!" The witness then said: "My God! who killed you?" He replied: "Andrew Walker killed me, and little Isham was there. The others I do not know." The attention of the witness was directed to her husband, and as she paid no attention to the men she could not recognize them. The men rode off in the direction of Mr. Butler's field, on the right hand side of the house. There were present at the house, at the time of the killing, the witness, Joe White, Ebbie Lewis and a negro woman. Joe White turned the deceased over after he was shot, and death ensued within ten minutes.

The witness was positive as to what her husband said after he was shot, and it was just as she repeated it on the stand, no more, no less, except that he asked Joe White to turn him over. He spoke rationally, and recognized the witness, Joe White and little Isham. Several strangers came to the house after the shooting. Mr. Morriss and his wife and Mr. Willis Coward came there, and the witness told them what the deceased had said. The killing occurred between seven and eight o'clock, but as it was a very clear, brilliant moonlight night, the witness

was not positive whether it was yet dark. It was just getting dark when they went in to supper, when the witness lit the lights. "Little Isham" is a Clear creek cow-boy, in the employ of Mr. Benson, and went with the crowd with which the deceased went.

At the time of the killing, the witness and the deceased had been married about eighteen months. The witness did not know the defendant, and had seen him but once up to that time. She did not live in that neighborhood previous to her marriage. She knew of no difficulty or antagonism existing between the defendant and the deceased; and she knew nothing of the deceased having received a warning of impending danger and advice to leave the neighborhood. She knew nothing of Mr. Lewis ever having given him such a warning, and she knew nothing of a difficulty between the deceased and Lewis in which pistols were drawn. She did not know where Mr. Lewis was on the night of the murder. He usually slept at the store, but sometimes at the house. Lewis and Mr. Benson came to the house some time after the death of the deceased. Benson's camp was a half mile distant from the house. Mr. White did not return to the house after the deceased was shot until the dead body was taken in. The witness saw Mrs. Walker once, and that was when the witness's baby was born. There was no ill feeling between the witness and any of the Walker family.

The substance of the testimony of Joe White, for the State, was that he was at Butler's house at the time of the shooting. The deceased was shot at his yard gate, some twenty or thirty steps from the gallery of his house. The moon was shining very bright, and was, at the time of the shooting, about as high in the heavens as the sun is at nine o'clock. The witness, who had been at Butler's house for a day or two, started off on some business on the evening of May 19, but, meeting Mr. Butler some distance from the house, and finding that his horse was too "fagged" to make the trip, returned with Butler. It was about sundown when he and Butler reached the horse lot. When they had put their horses up, they were informed that supper was waiting, and they went in and ate a light supper. It was now dusk, or late twilight, and candles were burning on the supper table. After a short time at supper, the witness and the deceased walked out upon the gallery, and had been there but a minute or two when two men rode up to the gate and asked for supper. The witness remained on the gallery, and the deceased

walked out to the men and said: "Come in, gentlemen." This invitation was followed by a shot, and, turning, the witness saw the deceased fall. The witness jumped from the gallery, then turned and went into the house to find a gun or pistol, if possible. He found none, after a hasty search, and went to where the deceased was lying. The deceased recognized the witness, and, calling the witness by name, asked him to turn him, the deceased, over, which the witness did.

After turning the deceased over, the witness asked him if he was dead. He answered: "Yes, I am dead. Andrew Walker killed me." The witness then went out at a side gate and returned in a moment or two, when the deceased, in a somewhat vexed tone, said: "Joe, turn me over." He talked rationally and recognized the witness, telling him twice that Andrew Walker had killed him; that "Little Isham" was present, and that he did not know the other party present with Walker. The parties who came up to the gate got down from their horses and hitched them on either side of the gate.

The deceased was in his shirt sleeves at the time he was shot. The shirt was powder burned by the discharge. The ball entered the right breast near the nipple, and lodged under the skin opposite. The deceased lived about ten minutes after he was shot by the man whom he said was Andrew Walker. Mrs. Annie Butler, the wife of the deceased, is now dead. The witness bent over the deceased until he was very near dead, and about the time that Mr. and Mrs. Morriss arrived the body was carried into the house. When the witness first got to Butler after he was shot, he saw a man about sixty yards out on the prairie, standing by the side of his horse, and apparently adjusting something about his saddle. Some one brought the witness a gun, but the witness found it unloaded.

In addition to this testimony the witness stated, upon cross-examination, that the man he saw standing by the horse wore a long coat, but the witness could not tell the color of his dress. The horse was a light colored animal. "Little Isham" came up to the gate about the time that the deceased was shot. Mrs. Butler was with the deceased when the witness reached him after the shooting. The witness had known the deceased and the defendant about five years, but had never known of a misunderstanding between them. The deceased had known the defendant a long time. "Little Isham" was a colored boy, who worked for the deceased.

Ebbie Lewis, the nephew of the deceased, testified, for the State, that he was at the house of the deceased when the shooting occurred.   The witness finished his supper before any of the others, and went out on the gallery and sat down on the steps, from where he had an unobstructed view to the gate.   The candles had not been lighted when the witness left the dining room, and the witness did not notice them alight until after the shooting.   While the witness was sitting on the steps two men rode up to the gate, one on a dark and one on a light horse. They dismounted and hitched their horses on either side of the gate.   One man was taller than the other.   They asked if they could get supper, and the deceased, handing his child to some one, said, "Certainly," and walked out to the gate, and the taller of the two men, when the deceased got within a foot of him, shot him.   When the pistol fired, the two horses broke loose, the light one ran off, and the other wheeled around.   The man who did the shooting mounted this horse and rode off in the direction of Summit.

When the shot was fired, Mrs. Annie Butler, wife of the deceased, resigned her baby to the nurse, and ran to him where he had fallen, and asked the deceased if he was dead.   He replied: "Yes, Annie."   She then asked who shot him, and he said that Andrew Walker shot him; that "Little Isham" was present, but that he did not know the other party.

Between fifteen and twenty minutes after the shooting, Mr. Willis Cowart came to the house, and went for Mr. John Lewis, then at Mr. Thompson's house, who shortly arrived.   The deceased was well acquainted with the defendant, having known him a long time.   The defendant was a cow-boy, and, as he worked on the prairie on which the cattle of the deceased ranged, he and the deceased saw a great deal of each other.

On cross-examination, the witness stated that the gate at which the shooting took place was five or five and a half feet high, and came to a point in the centre and sloped down at the sides.   It opened outwards, and was closed by a weight suspended on a rope running from it to a post in the yard.   The deceased had placed his hand on the gate and was opening it when he was shot.   He fell across the rope described and broke it.   Both of the men who came to the gate were tall, but one was somewhat taller than the other, and it was the taller who did the shooting.   The man who did the shooting was about as tall as the defendant, who is over six feet.   The witness did not

examine for horse tracks, nor did he recognize the light horse as the defendant's dun horse. He had known the defendant four or five years, but did not recognize him as either one of the men who came to the gate, nor did he recognize as his the voice that hailed at the gate. The men had on India-rubber overcoats, or, as they are called, "slickers."

"Little Isham," a colored boy, testified, for the State, that he was in the employ of the deceased at the time the latter was killed. Witness rode up to the house in a lope from "camp" near by, to get his supper, intending when he got to the gate to throw the reins of his horse over the post, and go in. When he got to the gate he found two horses, a sorrel and a dun, hitched there, and two men standing outside the gate, and the deceased standing inside. The witness stopped his horse between the two men, and lenned forward on his saddle. He heard the shorter of the two men, in a voice like a woman's, ask the deceased if they could get supper. The deceased told him to "come in," and placed his hand on the gate to open it. At this juncture the shorter man of the two caught the reins of the witness's horse and pushed him back, so that the taller man could go in the gate first. The taller man stepped up to the gate, pulled it open with his right hand, and stepped up to the deceased and shot him with a pistol held in his left hand. He did not extend his hand to shoot, but had it and the pistol concealed under his oil-cloth coat, and merely turned his hand, throwing the pistol towards the deceased, and fired. When the pistol fired the witness's horse turned and ran, and the witness applied the spur until he reached camp. The two horses at the gate broke loose, the sorrel stopping after wheeling around. The man who shot mounted this horse and rode off towards Summit. The dun horse ran into the prairie, and was followed and caught and ridden off after the other, by the shorter man.

The man who did the shooting was about as tall as the defendant, and had chin whiskers, such as the defendant wore at that time. He had his side face towards the witness at that time, and his hat pulled low, and the witness could only see the lower or chin part of his face. Both men wore yellow coats buttoned close up to the chin. The witness had known the defendant for some time, but could not say that the tall man who did the shooting was he. The witness had seen the defendant's dun horse several times. The light horse which was tied at the gate at the time of the shooting looked something like the defend-

2 N

ant's dun horse; was built and shaped like him, but the witness could not say that it was the defendant's dun horse.

Cross-examined, the witness stated that, having no idea that anything was going to happen, he, as cow-boys generally do, directed more attention to the horses than he did to the men. The light horse looked like the defendant's dun horse, both in color and size.

On re-examination the witness stated that the defendant rode the same prairie that he did. He had never seen the defendant's dun horse since the night the deceased was killed. Re-crossed, the witness stated that he knew many of the cow-ponies used on the prairie. Cow-men did not, so far as the witness knew, usually wear oil coats in the spring or warm weather. It was neither cold nor wet weather in May, 1872. When the witness rode up to the gate, he was thinking of nothing but his supper; when the pistol fired, he thought of nothing but getting away.

John Lewis testified, for the State, that he knew the defendant well, and knew that, prior to the death of Butler, he, defendant, owned an extra good dun cow-pony. The witness had often seen him ride the dun pony before the killing. He had never seen the dun pony since the death of Butler. He had often seen the defendant rope cattle, and knew that in roping cattle the defendant invariably used his left hand.

H. N. Morriss testified, for the State, that from his house, a short distance from Butler's, he heard the shot fired which killed Butler, and heard Mrs. Butler scream. He started to Butler's in great haste, and *en route* between the two points saw a man riding a large sorrel horse. When the man saw the witness, he rode into the shade of a tree and stopped. He was a tall man, about the height of the defendant. The stirrups were too short and his legs were drawn up. He had a pistol in his left hand, resting across his knee, and pointing towards the witness's feet. When the witness saw the pistol he whirled, and as he did so he saw a man in the prairie coming from towards Butler's gate.

G. W. Butler, brother to the deceased, testified that the defendant habitually roped cattle, shot, and cut with his left hand. The deceased knew the defendant well. A short time before the killing John Lewis, the brother-in-law of the witness and the deceased, and the defendant had a difficulty. Thereupon the deceased and the witness sent to Brazos county, where a charge of murder was pending against the defendant, to get a *capias* for his arrest. The witness could not say that the defendant

knew of this. The defendant owned a dun horse before the killing. Since that time the witness has never seen that horse. The State closed.

The death of the witness Smith was established by the defense, and his testimony on a former trial shown to have been as follows: "The distance between the houses of Hugh Kelly and Green Butler, by the map, is, in a direct line, four and three-fourths miles, and, by the nearest traveled route, a fraction over five miles. The distance from Green Butler's to the Summit, in an air line, is five and five-eighths miles; the nearest traveled route three-fourths of a mile added, making it six and three-eighths miles from Butler's to the Summit. From Hugh Kelly's to the Summit, in an air line, it is five and three-fourths miles, the route being very near straight. One can see four and three-fourths miles from Kelly's towards the Summit over open prairie. The distance from Mrs. Walker's to Kelly's is about one and a half miles, in a southerly direction. From Green Butler's gallery to the gate the distance is thirty feet, the house fronting the gate."

It was duly proved that on the nineteenth day of May, 1872, the sun set at fifty minutes past six, and that the moon filled on the twenty-first day of May.

Hugh Kelly testified, for the defense, that he last saw the defendant, before the killing, about a quarter of an hour before sundown on the evening when the killing occurred. Defendant, Jeff Black and Amos Walker came to the witness's house at that hour on that day, and left at sundown. The witness poured out some whisky, and he, Amos Walker and Black took a drink, but the defendant declined. Witness invited them to remain to supper, but they declined. Witness did not see which way they went, nor did he see their horses. On the Wednesday night before the defendant surrendered, officer Price told the witness that the defendant wanted to see him at Sam Allen's ranch. The witness at first declined to go, but finally consented, and went on Thursday, when the defendant surrendered to the sheriff. The witness milked his cows that evening, because no one else was about the house to do so. Nothing of an important nature was developed by the cross-examination.

Neal Burdick, a clerk in Kelly's store, which was situated near Kelly's house, testified, for the defense, that on the nineteenth day of May, 1872, the day of the killing, he went visiting, about two miles distant from Kelly's. He started home at half-past

five o'clock p. m., by the watch. When he reached Kelly's, having ridden slow, because his horse was young, it was about sundown. The defendant, Amos Walker and Jeff Black were at Kelly's when he reached there. They left shortly afterwards, declining to remain to supper, the defendant saying that he was unwell and would go to camp. When they left the store, they went towards the gate. The witness did not see their horses though he could have done so had he gone to the front gate. About fifteen minutes after the defendant and his party left, Jerry Thornton came to the store for some meal, and the witness had to strike a light to weigh it for him. Jerry Thornton lived with his father, about one and a quarter miles from Kelly's. The road from Kelly's to Summit runs by Thornton's place.

On cross-examination, the witness testified that he drove the cows up that evening, and that Kelly's daughter milked them. Nothing else of a material nature was developed by the cross-examination.

Jerry Thornton, for the defense, testified that his father sent him to Kelly's store for meal, late on the evening of the killing of Butler. *En route*, he met the defendant, Amos Walker and Jeff Black at the bridge, about one hundred yards from Kelly's store. It was dark, and no one stopped.

Cross-examined, the witness stated that on his return home he told his father about meeting the defendant, Amos Walker and Black, without his father asking him ·anything about them. The witness and the defendant addressed each other, saying "howdy." The defendant was riding a dun, and the other two were riding sorrel horses. They had their oilcloths tied behind their saddles. A light had to be procured at the store to weigh the meal.

Bob Thornton, father of the last witness, testified for the defense, and related nothing inconsistent with the testimony of his son, Jerry, except that he asked Jerry who the men were before Jerry told him their names.

The testimony of Wm. Faddin and Jo. Owens, for the defense, was essentially the same, and, shorn of detail, was, in substance, that they and the defendant were in the employ of Sam Allen, as cattle men. Jeff Black left Allen's cattle ranch early on the morning of the killing to hunt a mare, riding an old bay horse. The defendant, riding a dun pony, and Amos Walker, riding a very inferior bay cow-pony, left the ranch at about eleven o'clock on the same day, to go to their mother's, near Kelly's, saying that

they would meet Allen's men that night in camp, at Summit, to go on a camp hunt the next day. The defendant, Amos Walker and Black reached the camp at Summit that night at about fifteen minutes past eight o'clock, and remained over night in the camp. The next morning, after breakfast, Amos Walker, riding the same horse he rode the day before, and leading the defendant's dun pony, rode out of camp towards Allen's ranch, and had not been seen since. The dun pony was returned to the ranch a month later, and died at the ranch of epizootic. The defendant and Jeff Black, together with the witness and others of Allen's men, spent the entire day of the twentieth of May, 1872, together, hunting cattle in Vincent's cove. The party were within a mile of Butler's house during the day. They heard of Butler's death about three o'clock p. m., and heard, at the same time, that defendant, Amos Walker and Black were charged with the murder. The defendant and Black remained in camp that night, and left together next morning, going towards Allen's ranch.

On cross-examination, each witness declared that they had long known the defendant, and had always known him to use his right hand in roping cattle. If he was left-handed they had failed to find it out, after long and intimate association.

Jeff Black, whose deposition was taken for the defense in New Orleans, Louisiana, was shown to have since died, and his deposition was read. In it, Black accounts for his own whereabouts from sunrise on the morning of the day of the killing until the day after, and for the whereabouts of the defendant and Amos Walker from twelve o'clock on the day of the killing until the day after, claiming that at no time within that period were any of them nearer Butler's house than five miles, except one time on the day after Butler's death, when, on the cow hunt, the party, including himself and defendant, passed within about one and a half miles of Butler's house. (Black had obtained an acquittal some time previous to this trial.)

James Thompson testified, for the defense, that he lived one and a half miles from Butler's house. John Lewis was at his, witness's, house when Butler was killed. Cowart reached witness's house and told Lewis of the murder between three and five minutes before the clock struck eight. The defendant was not left-handed.

James Lewis, recalled by the State, testified that a person going from Kelly's to Summit would cross a small bridge one or two hundred yards from Kelly's, and pass within two hundred

yards of Bob Thornton's house, a mile and a half beyond. After passing Thornton's such person could turn into the timber, cross Turkey creek, and go to Butler's without traveling over five miles, and pass no houses *en route*. The defendant knew that route quite well. Subsequent to the killing, the witness had ridden an ordinary cow-pony from Butler's to Summit over the route the parties were described as taking after the shooting, in twenty minutes. The watches used at either end were accurately timed together. Major McLemore, one of prosecuting counsel, timed the witness at the coming out point, Summit.

The motion for new trial raised the questions discussed in the opinion.

*C. L. Cleveland* and *Charles Stewart*, for the appellant. The first assignment of error is that the court erred in overruling the motion of defendant for a continuance.

The application for a continuance is to be found in the record, and we invite the most careful scrutiny of the court to it, feeling confident that it will be found to be strictly and completely in accordance with the statute regulating continuances. Notwithstanding this case had become famous, because of its long pendency—it having been more than ten years since the indictment had been found and the defendant first arraigned for trial—yet this was the first time in the history of the cause that the defendant had ever asked for a postponement of the trial. The application for a continuance shows that all proper diligence had been used to procure the attendance of the absent witnesses. The testimony of such witnesses was shown to be material; not only material, but absolutely necessary and indispensable to a proper defense. It was important to show every movement of the defendant on the day of the homicide, and especially was it necessary to follow him every minute for a few hours preceding the time of the death of Butler, in order to ascertain if it were possible for him to have been the murderer; hence the importance of the testimony of Mrs. Young. And notwithstanding it may be urged that her testimony was unnecessary, because of the testimony of Hugh Kelly and Neil Burdick, yet we conceive that in this cause, where the evidence adduced by the State is so unsatisfactory (to use no stronger term), and fraught with so momentous consequences to the defendant, he was entitled to the privilege of introducing all his testimony, and should not have been deprived of one link in the chain of facts showing the

impossibility of his guilt. These great questions of fact, upon the establishment of which depended his guilt or innocence, his conviction or acquittal, required all the light of testimony possible to have been obtained.

The testimony of the witness Dirks was material, because it was proper to prove that the defendant, when within his power to have escaped, made voluntary surrender of himself to the sheriff of Galveston county. How far this fact might have contributed to aid other facts in testimony, in convincing the jury of his innocence, it is impossible for any one to say; and we repeat the assertion that he was entitled to all the testimony he could produce in his favor. The testimony of S. E. Allen was very important. All the evidence showed that the defendant and his two companions, Jeff. Black and Amos Walker, left Kelly's house about sundown, or not far from it; that they were met by Jerry Thornton at the bridge not far from Kelly's, on the road from Kelly's to the station on the Houston and Galveston railroad called Summit; that shortly after Jerry Thornton passed them at said bridge, they were seen by Bob Thornton on the Summit road, going in the direction of Summit; and in view of these facts, with the additional testimony of John Lewis, a witness for the State, that after leaving Bob Thornton's house, they might have easily taken an old road leading to Butler's house, or could have reached Butler's house easily by leaving the Summit road and going across the country without following any road, it became important to prove that they never left the road to Summit, but continued in it until they reached their camp at Summit. This fact was proven by Charles Lee, at the first trial had of this cause. Lee had departed this life, and we sought to reproduce his testimony by Allen, who had heard him testify, and could have done so. The materiality of this testimony can not be questioned by any one.

The court below admitted the application for a continuance to have been good, but, in consequence of section six of article five hundred and sixty of the Code of Criminal Procedure, claimed the right to exercise the discretion of putting the defendant on trial. If the court did have this right, and did properly exercise the discretion vested in it, then we say the trial of the case developed the materiality of the absent testimony for which the continuance was sought, and a new trial should have been granted; and the tenth assignment of error is well taken.

When the motion for a continuance was made, no counter-

affidavit was filed by the State, but hearing of a motion for a
new trial, the affidavit of one Lewis was received to show that
at a former trial one Ben Kelly had reproduced the testimony of
Charles Lee, and that Kelly had been in attendance upon the
court during this last trial. How this affidavit could have
tended to contradict the affidavit of defendant, we are at a loss
to conjecture. Lewis could not have known that Kelly then,
after the lapse of years, was able to state both the direct and
cross-examination of Lee. The fact that Kelly was present at
the trial, and did not attempt to do so, is strong presumptive evi-
dence that he was not able to do it, for certainly the defendant
would have used his testimony if he had been able to testify.

The taking and hearing of this counter-affidavit by Lewis, we
hold to be error. The counter-affidavit, if received at all, should
have been heard when the application for continuance was
heard. (See Code Crim. Proc., Art. 564.) When such counter-
affidavit is heard, the statute prescribes the duty of the court.
(See Code Crim. Proc., Art. 565.)

We think the application for continuance was amply sufficient
in the first instance, and should have been granted, and that at
any rate, after trial was had, and the materiality of the absent
testimony shown, new trial should have been granted. (*Hyde*
v. *The State*, 16 Texas, 445; *Austin* v. *The State*, 42 Texas, 345;
*Dinkins* v. *The State*, 42 Texas, 250; *Hipp* v. *Bissell*, 3 Texas, 22;
*Peeler* v. *The State*, 2 Texas Ct. App., 455; *Skaro* v. *The State*,
43 Texas, 88; *Shackelford* v. *The State*, 43 Texas, 138; *Murry* v.
*The State*, 1 Texas Ct. App., 175; *Cooper* v. *The State*, 19 Texas,
449; *Baines* v. *The State*, 41 Texas, 342; *Laubach* v. *The State*,
12 Texas Ct. App., 591.)

The second, third, fourth and fifth assignments of error relate
to the refusal of the court to grant special charges to the jury
requested by defendant. We think all these charges were cor-
rect, and ought to have been given; that they contained a more
comprehensive statement of the law than did the general charge
of the court, where it touched upon the law set forth in these
special charges. We do not waive any of these assignments of
error, but we wish particularly to call the attention of this court
to special charge number two, refused by the court below. It
reads:

"The defendant, by his counsel, requests the court to give in
charge to the jury, that whilst it is true that dying declarations,
made with knowledge or belief that death is impending, are

receivable in testimony, yet they are not to be regarded as entitled to greater belief because made by one who knows he is near death; but all the circumstances under which he received his belief of facts stated by him, in regard to the person who killed him, and the manner of killing, should be regarded by the jury so far as they are shown by the testimony, and from those circumstances the jury may determine what, if any, credit should be given to such dying declarations."

We think this charge should have been given. It is not upon the weight of the testimony. It simply gives the rule of law applicable to such testimony, and when the State rests its case upon "a dying declaration" alone, uncorroborated by one single fact, and with no possible motive shown for the commission of the act by defendant, and when the deed was perpetrated after dark, with an intervening fence between the deceased and his slayers, we think the law, nay humanity itself, requires that the jury should be properly instructed as to the law governing such testimony. (See *Lambeth* v. *The State*, 1 Cushman, Miss. Rep., 358, *et seq.*; *Brown* v. *The State*, 3 George, Miss. Rep., 433; 17 Ills. Rep., 17; *Black* v. *The State*, 1 Texas Ct. App., 368.)

Sixth assignment of error: "The court erred in causing the jury to retire and to make up another verdict after the court had received a verdict assessing the punishment of defendant at confinement in the State penitentiary for the term of ninety-nine years, as shown by bill of exception number three, to be found in the record."

The bill of exception mentioned in the assignment is respectfully referred to. The verdict was in writing, and had been delivered to the clerk, who read it in open court in presence of the defendant. The court caused the papers to be returned to the jury, and informed them that their verdict was not responsive to the issues submitted to them, and to retire again and consider of their verdict.

In what respect was the verdict not responsive to the issues submitted to them by the court? What were the issues? The issues were: Did or did not the defendant kill Green Butler; and if he did, of what offense was he guilty? If in their investigation of the case after their retirement to consider of their verdict, they became satisfied beyond a reasonable doubt that defendant did kill Butler, were they required to say that it was murder in the first degree? Under our law, who defines the degree of guilt and assesses the punishment—the court or jury?

We know that the jury are not the judges of the law in any case, but are the exclusive judges of the facts in every criminal cause. (Code Crim. Proc., Art. 676.) But is it true that, after the jury found that the defendant did kill Butler, the court could then define the degree of his guilt, and assess the punishment? The action of the court in this case asserts that right—at least the action of the court forced the jury to affix the degree of guilt and the punishment therefor. Can a court thus dominate over a jury? In our Bill of Rights it is provided: ''The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency." This certainly does not mean that the Legislature may so regulate the jury trial as to substitute the power of one man for that of the twelve. The punishment assessed by the jury in their first verdict was such as could be affixed to murder in the second degree; and did not this verdict acquit the defendant of murder in the first degree? It seems to us that the court transcended its power when it caused the jury to retire and consider of another verdict.

Eighth assignment of error: The court erred in entering judgment in this cause, because there is no sufficient and legal verdict upon which such judgment could be rendered, the verdict of the jury being as follows:

"Wee the jurors finde the defendant gilty and of mrder in the first degree and assess his confinement in the penetentery for life.

"W. H. WHITTINGTON, foreman."

Said verdict being void, as it finds defendant guilty of no offense known to the law, and does not assess the punishment as required by law.

Bad spelling will not vitiate a verdict, but a verdict should be intelligible. The verdict in this cause is unintelligible. Mrder does not spell murder, nor can it be regarded as an abbreviation of the word. *Idem sonans* cannot be invoked to sustain it. Burgerally sounds more like burglary than does mrder like murder. (*Dillon* v. *Rogers*, 36 Texas, 153; *Long* v. *The State*, 34 Texas, 567; *Sheffield* v. *The State*, 1 Texas Ct. App., 640; *Haney* v. *The State*, 2 Texas Ct. App., 505; *Keeler* v. *The State*, 4 Texas Ct. App., 527; *Taylor* v. *The State*, 5 Texas Ct. App., 569; *Shaw*

v. *The State*, 2 Texas Ct. App., 487; *Doran* v. *The State*, 7 Texas
Ct. App., 387.)

The ninth assignment has already been considered in the dis-
cussion of the first assignment of error.

The tenth assignment it is unnecessary to discuss, for if either
of the other assignments are well taken, it follows as a matter
of course that new trial should have been granted.   The other
assignments are not to be regarded as waived, but we will not
attempt to discuss them within the compass of a brief, prefer-
ring to present them in oral argument.  The facts are insufficient
to support the verdict.  (See 30 Texas, 373; 27 Texas, 329; 32
Texas, 111; 22 Texas, 404; 41 Cal., 67; 42 Ind., 374; 33 Iowa, 553;
2 Humph., 442.)

*J. H. Burts*, Assistant Attorney General, for the State.

*M. C. McLemore*, also for the State.   The motion for continu-
ance was based on the absence of several witnesses.   The mate-
riality of the evidence of the absent witnesses was undertaken
to be shown by the recitation of that which it was expected to
prove by each of them.   One witness was to show that the de-
fendant below had made a voluntary surrender to the officers of
the law, and on the trial this fact was established and was not
controverted.   Another witness was to show that the defendant
had been met, with the two jointly indicted for murder with
him, at a point remote from the scene of murder, about sundown
or dusk, which fact was to be proven by the procurement of the
testimony of the absent witness, through his recollection of
what a deceased witness had testified to on a previous trial of
Walker, the defendant.   On the trial it was testified to by four
different witnesses that the same three, the defendant, Black
and Amos Walker (jointly indicted for murder), had been seen
together within a half an hour (or less) at a point equally dis-
tant from the scene of the murder, immediately before the time
when the absent witness's testimony would place the defendant,
and on the same road, not more than a mile or mile and a half
from the point where the absent witness saw the three; and it
was proven that the three could have been at the murder if they
had been met as the absent witness testified they were.   And
one witness testified that in fact the three did meet the absent
witness at the place the absent witness would have testified they
were met, and about the same time; and about which there was

no controversy so far as related to the fact of the three having been on the road and at the place referred to; the entire controversy being as to whether the defendant committed the murder, notwithstanding the fact that these three were on the road spoken of as testified by four of defendant's witnesses. The effect of the missing witness's evidence being only to place the three together a little later in the day, say one fourth of an hour, not more, on the same road.

The truth being, as the record manifestly discloses, that the murder was committed after dark, about twenty or twenty-five minutes, as near as could be stated. before eight o'clock, and this missing evidence was the statement of one of five or six witnesses that the defendant was, between six o'clock and dusk of the day of the murder, so far distant from the scene of the murder as that he could not be the murderer as charged in the indictment, and the absent witness saw the defendant only about one-fourth of an hour after the others of these on that evening.

Besides, the record shows that no sufficient diligence was used to get the absent witness on the trial. Another absent witness was to show what three or four others proved on the trial, which was that Walker was within about five and a half miles of the scene of the murder a short while before sundown of the day of the murder, and that he had been around there all the afternoon—about which there was no question as to the facts testified to by all the witnesses. The only question was whether, after the defendant was last seen on the road referred to (before and about dusk), he could have ridden with his companions to the scene of the murder, the distance being about five miles, not more, and the sun setting ten minutes before seven o'clock, and the murder committed about twenty minutes before eight o'clock.

Another witness was wanted to prove that Jeff. Black, one of defendant's witnesses, had enjoyed a good reputation for truth and veracity, and on the trial there was no issue as to the character of Black for truth and veracity; besides, the evidence shows that Black had a number of friends and acquaintances who testified on the trial, and none were asked as to this matter of truth and veracity.

After all the evidence had been submitted to the jury and the court, it was manifest to the judge that the case of the defendant could not have been changed by the missing evidence, and that a new trial should not be granted merely to allow defend-

ant to prove what was not controverted, and which had been abundantly proven on trial.

The entire question was as to the identity of Walker as the murderer, assuming that all the evidence was true as to his whereabouts on that evening an hour or so before the crime was committed, when no witness, present or absent, did testify, or could have testified, within half an hour of the time when Walker was seen any distance from the scene of the murder, and when all the evidence shows that Walker could have ridden from where he was last observed to the scene of the murder in the space of half an hour or less, if he desired.

And neither jury or the judge doubted that Walker did make the ride and did commit the murder, and hence new trial was refused. (Code Crim. Proc., 560 and 781.)

The dying declarations of the murdered man were admitted as evidence after the predicate had been fully and satisfactorily laid, and were admitted as evidence without even objection from defendant's counsel, and, as such, were competent evidence, to be considered by the jury as other evidence. As to how much importance was to be given to any of the evidence, was a question for the jury, and the only object that could have been in view of counsel in asking the charge on that question as printed in their brief, was to suggest that, *as evidence*, it was of an exceptional character, and should be very narrowly criticised. The court charged: "Was the defendant, Andrew Walker, at the time of the killing, at some other place than that of the killing? If so, or if the evidence raises in your minds a reasonable doubt as to the presence of the defendant at the place and time where Butler was killed, you will acquit."

Statement: The minutes of the court, which contain the verdict (or what purports to be a copy), and the judgment entered thereon, read as follows:

"Wee, the jurors, finde the defendant gilty, and of mrder in the first degree, and assess his confinement in the penitentiary for life.

"W. H. WHITTINGTON, foreman."

And the minutes continue as follows: "which said verdict was then and there read aloud by the clerk as follows: 'We, the jurors, find the defendant guilty of murder in the first degree, and assess his confinement in the penitentiary for life;' and the jury

being then and there asked if that was their verdict (as just read) by the court, answered it was. Thereupon, at the request of State's attorney, the jury was polled, and each juror was asked by the court if the verdict (the verdict read by the clerk) was his verdict, to which each juror answered in the affirmative.

"It is, therefore, considered by the court that the defendant, Andrew J. Walker, in accordance with the verdict of the jury, be and is hereby adjudged guilty of murder in the first degree."

The precise chirography of the verdict as handed to the clerk is difficult here to determine, but it was read aloud as recited in the minutes of the court on rendition of the judgment, and the jury more than once stated that the verdict, as read, was the verdict rendered by them, and the court accepted the verdict as read by the clerk and interpreted by the jury, as polled.

Besides, the same jury had already written and returned into court a well defined verdict finding the defendant guilty of murder in the first degree, and thereby manifested their conclusion on the evidence, and only retired to reform the verdict, in order to assess the punishment as allowed by law. So that the jury, the clerk and the court all agreed that the verdict was as read, and on which judgment was rendered.

And defendant's bill of exception shows that the foregoing facts are true, and that the exception was based on the ground of the former verdict having been rendered, and not on the writing being different from the verdict as read and approved by the jury. (*Lindsay* v. *The State,* 1 Texas Ct. App., 331; *Jones* v. *The State,* 4 Texas Ct. App., 529; *Taylor* v. *The State,* 5 Texas Ct. App., 571; *Dillon* v. *Rogers,* 36 Texas, 153.)

*G. W. Davis,* also for the State, on the question of motive, cited `Hyde` v. *The State,* 16 Texas, 445; *Williams* v. *The State,* 11 Texas Ct. App., 63; *Jones* v. *The State,* 40 Texas, 188; *Dowdy* v. *The State,* 9 Texas Ct. App., 292; *Robles* v. *The State,* 5 Texas Ct. App., 346; Id., 521; *Jackson* v. *The State,* 4 Texas Ct. App., 292; Id., 419; *Meyers* v. *The State,* 7 Texas Ct. App., 640; Id., 518.

WILLSON, J. This cause has become a noted one in the judicial annals of this State, having been pending in the courts for more than ten years, and having several times been tried in the district courts, and convictions obtained, and those convictions reversed by the Supreme Court and by this court. A full history

of the case may be had by reference to the several reports of it to be found in 37 Texas, 366; 42 Texas, 360; Id., 377; 1 Texas Court of Appeals, 368, and 3 Texas Court of Appeals, 668.   Appellant Walker has been three times convicted of murder in the first degree, with his punishment on the first two convictions assessed at death.   On the third and last conviction, from which this appeal is prosecuted, his punishment is assessed at confinement for life in the penitentiary.

A number of errors are assigned and insisted upon by appellant upon this appeal, which we will dispose of, but not in the order in which they appear in the record.

Assignments of error from second to fifth, inclusive, relate to the refusal of the court to give certain special charges requested by appellant's counsel.   Without entering upon a minute discussion of these refused charges, suffice it to say that in our opinion the charge of the court as given to the jury embraced all the law of the case as applicable to the evidence, clearly and correctly expressed, and is in all respects a fair, comprehensive and complete charge.   As to charge number one, asked by appellant, it undertakes to explain to the jury the meaning of a reasonable doubt.   Under the decisions of this court it was properly refused.   (*Massey* v. *The State*, 1 Texas Ct. App., 563; *Chapman* v. *The State*, 3 Texas Ct. App., 67; *Ham* v. *The State*, 4 Texas Ct. App., 645; *Bland* v. *The State*, 4 Texas Ct. App., 15; *Fury* v. *The State*, 8 Texas Ct. App., 471.)

Charge number two, requested and refused, and which is strenuously insisted upon by appellant's counsel as a proper charge, and not embraced in the general charge given to the jury, was, we think, correctly refused.   It discusses the nature of dying declarations, and the rules by which the jury should be governed in considering such testimony.   A charge must not philosophize as to the nature and force of a particular species of evidence. That is the peculiar province of the jury.   (*Harrison* v. *The State*, 8 Texas Ct. App., 183; *Bouldin* v. *The State*, Id., 332; *Hodde* v. *The State*, Id., 382.)   Furthermore, the evidence to which this charge related was not admissible alone as dying declarations, but was also admissible as *res gestæ*, and was entitled to consideration by the jury as such.   (Clark's Cr. Laws, page 540, note, *Res Gestæ; Brunet* v. *The State*, 12 Texas Ct. App., 521; *Black* v. *The State*, 1 Texas Ct. App., 368, where this very evidence was held to be admissible as a part of the *res gestæ*.)

As to the other two charges asked and refused, they were not applicable to the evidence, and were not the law of the case as we understand it, and were properly refused.

In answer to the sixth assignment of error, we think it is sufficient to say that the verdict first returned into court being manifestly informal and insufficient, it was the duty of the court to refuse to receive it, and to call the attention of the jury to its defects, and direct them as to its correction. (Code Crim. Proc., Arts. 715, 716; *Alston* v. *The State,* 41 Texas, 39; *Wooldridge* v. *The State,* decided by this court at present term, *ante,* p. 443.)

That the verdict was received by the court on Sunday is the objection presented by the seventh assignment of error. This precise objection has been determined by this court, and it has been held that it is not error to receive a verdict on Sunday. (*Shearman* v. *The State,* 1 Texas Ct. App., 215; *McKinney* v. *The State,* 8 Texas Ct. App., 626.)

By the ninth assignment of error the sufficiency of the verdict as returned into court, and upon which the judgment of conviction is based, is called in question. This verdict, as we copy it from the judgment entry, the original not having been sent up with the record, reads as follows: "Wee the jurors finde the defendant gilty and of *mrder* in the first degree, and assess his confinement in the penetentiary for life." It is objected to this verdict, 1, that it finds defendant guilty of no offense known to the law; and, 2, that it does not assess the punishment as required by law. It will be perceived that in the verdict the defendant is found guilty of *mrder,* the letter "u" being left out of the word which the jury evidently intended to use.

In the Wooldridge case, decided by this court at the present term (*ante,* 443), the rules governing verdicts in murder cases were elaborately discussed, and it is unnecessary for us to reiterate them. In that case the word "fist" was used in the verdict, instead of the word "first," in finding the degree of the murder. It was held that these two words were well known and commonly used words, having entirely different meanings, and not sounding alike, and that the one could not be substituted for the other, or construed to mean the other, and that the verdict was insufficient. It was, however, expressly stated in the opinion in that case that, as the word "fist" used in the verdict did not have the sound of the word "first," which should have been used, the question of *idem sonans* was eliminated from the case, and was not considered.

In the case before us the question of *idem sonans* does arise, and directly affects the verdict. If the word "mrder" used in the verdict is not *idem sonans* with the word "murder," then manifestly this verdict is insufficient and must be set aside. But if the words *are idem sonans*, then the verdict must be sustained, notwithstanding the bad spelling of the word in the verdict, for it is well settled that incorrect orthography or ungrammatical language will not vitiate a verdict. (*Taylor* v. *The State*, 5 Texas Ct. App., 569; *Koontz* v. *The State*, 41 Texas, 570; *McMillan* v. *The State*, 7 Texas Ct. App., 100; *Curry* v. *The State*, Id., 91.)

In applying the doctrine of *idem sonans*, the rule is that if the words may be sounded alike without doing violence to the power of the letters found in the variant orthography, then the words are *idem sonans*, and the variance is immaterial. (*Henry* v. *The State*, 7 Texas Ct. App., 388; *Ward* v. *The State*, 28 Ala., 53; *Gresham* v. *Walker*, 10 Ala., 370; *Gahan* v. *The People*, 58 Ill., 160.)

Applying this rule to the word "mrder," used in the verdict, we hold it to be *idem sonans* with the word "murder," as properly spelled, and that the variance in the authography of the two is not a material one, but that their sound is so nearly the same, when pronounced, that there is scarcely, if, in fact, any difference. They are not different words correctly spelled and not sounding alike, as in the Wooldridge case, before referred to, but are, in fact, the same word differently spelled, but sounding alike. We think, also, that the doctrine of *idem sonans* applies to and governs verdicts in the same manner, and to the some extent, that it does in other matters. (*Haney* v. *The State*, 2 Texas Ct. App., 504; *Taylor* v. *The State*, 5 Texas Ct. App., 569; *Huffman* v. *Com.*, 6 Rand., Va., 685; *Williams* v. *The State*, 5 Texas Ct. App., 226; *The State* v. *Smith*, 33 La. Ann., 1414.)

In regard to the second objection urged to the verdict, that it does not assess the punishment as required by law, we do not think it is well taken. It is true that the verdict does not use the word "punishment," nor is there any provision of law which requires that it should. In place of the word "punishment," the word "confinement" is used in the verdict, which, to our minds, clearly conveys the meaning that the jury assessed his punishment at confinement, etc. Verdicts are to have a reasonable intendment, and to receive a reasonable construction, and are not to be avoided, unless from necessity, originating in doubt of their import, or immateriality of the issue found, or

their manifest tendency to work injustice, or their failure to contain that which some express provision of statute requires they shall contain. (*Williams* v. *The State,* 5 Texas Ct. App., 226; *Wooldridge* v. *The State,* decided at present term, *ante,* p. 443; *People* v. *Gilbert,* 2 Crim. Law Mag., 283.)

Other assignments of error, necessary to be noticed and determined, relate to the action of the court in refusing defendant's application for a continuance, and in overruling his motion for a new trial; and these assignments we shall consider together.

Defendant's application for a continuance of the case was a first application, which is an unusual feature in cases of this character pending in the courts for so long a period of time. It was based upon the grounds of the absence of several of his witnesses, and of his leading counsel. It contained all the formal requisites of a first application as prescribed by the statute, and it is only necessary that we should consider it in reference to, first, the materiality of the testimony of the absent witnesses; second, the diligence used to obtain that testimony; and third, the sufficiency of it upon the ground of the absence of his leading counsel.

First, as to the materiality of the testimony. By the witness Mrs. Alice Young he expected to prove that he was at his mother's on the Sunday the murder occurred; that he, in company with Jeff Black, left his mother's house in the afternoon, when the sun was about half an hour high, and went in the direction of Mr. Hugh Kelly's, and that she watched them until they were about half way to Mr. Hugh Kelly's. Taken in connection with the other evidence in the case, we cannot see the materiality of this testimony, because we think it was fully supplied by other evidence on the trial, and would only be cumulative evidence at most. It will be seen, by reference to the statement of facts, that Hugh Kelly, towards whose house Mrs. Alice Young saw the defendant and Jeff Black going, testified that they came to his house on the evening of the murder about a quarter of an hour by sun, and left there about sundown, having remained at his house about fifteen minutes. Neal Burdick, another witness, testified substantially as did Hugh Kelly. Another witness, Jerry Thornton, testified that on the same evening, about dark, he met the defendant and Jeff Black about one hundred yards from Hugh Kelly's house, coming from the direction of the house. This evidence, we think, fully supplies the testimony of the absent witness, Mrs. Young, and no injury

could possibly have resulted to the defendant because of the absence of her testimony. It has been held by this court, that if substantially the same testimony as that which is absent has been produced on the trial, the accused cannot complain, and such, we think, was the case as to the testimony of Mrs. Young. (*Fisher* v. *The State*, 4 Texas Ct. App., 181; *McCarty* v. *The State*, Id., 461.)

By the witness Frank Dirks defendant expected to prove that, soon after the murder of Butler, the defendant telegraphed witness, who was then sheriff of Galveston county, to come and arrest him (defendant having heard that Dirks had a warrant for his arrest for the murder of Butler), and that Dirks did go, and that defendant voluntarily surrendered to him. This evidence, had it been offered, would not have been admissible. Declarations or acts of a defendant in his own favor, unless part of the *res gestœ*, or of a confession offered by the prosecution, are not admissible for the defense. (Wharton's Cr. Ev., sec. 690.) This evidence clearly could not be considered as part of the *res gestœ* of the murder (Whart. Cr. Ev., sec. 262, *et seq.*), nor was it a confession offered by the State, nor was it in rebuttal of any fact proved or attempted to be proved by the State; as the flight, concealment, or other suspicious conduct of the defendant after the murder. As this case is presented to us by the statement of facts, we are clearly of the opinion that the testimony of Dirks is incompetent, and therefore immaterial, and that defendant has sustained no injury by not having it on the trial. Besides, it was indisputably proved on the trial by other witnesses that the defendant voluntarily surrendered to the officer of the law in a short time after he was accused of the murder. (*Bowen* v. *The State*, 3 Texas Ct. App., 617; *Krebs* v. *The State*, 8 Texas Ct. App., 1.)

By the witness Sam. E Allen defendant expected to reproduce the testimony of a deceased witness, Charles Lee, who had testified in his behalf on a former trial of the case. That the testimony of this deceased witness Lee, as set forth in the application for a continuance, was material to the defendant, we will not controvert. We think it was material in view of the other evidence in the case, and the only question in regard to it is, did the defendant show diligence to obtain it? If he did, then we could not say but that he was entitled to a continuance to enable him to obtain it. This brings us to the question of the diligence used by defendant with respect to procuring the attendance of

the witness Allen, and the diligence used to reproduce the evidence of the deceased witness Lee.

Before proceeding farther upon this point, we will state that the application for continuance, as to the matter of diligence, was not controverted as might have been done at the time it was presented to the court. (Code Crim. Proc., Arts. 564–565.) But in his motion for a new trial the defendant made one of the grounds of the motion the refusal of the court to grant his application for a continuance. Thereupon the State took issue with the defendant upon the truth of the causes set forth in the motion for new trial, and upon that issue evidence was heard by the judge in relation to the sufficiency of the diligence used to obtain the testimony of the witness Allen, and to reproduce the testimony of the deceased witness Lee. This, we think, was warranted by the law, and cannot be complained of as error. (Code Crim. Proc., Art. 781.) In considering the question of diligence, therefore, we feel authorized to look not only to the application for continuance, but also to the evidence adduced upon the trial of the issue as to the truth of the causes set forth in the motion for a new trial.

Witness Allen was a resident of Harris county, the county site of which county, the city of Houston, is distant from the town of Liberty, where this cause was tried, about forty miles. At the time of the trial, and for some time previous thereto, there was constant daily communication by rail between the two places. In March, 1882, the witness Allen, at the instance of defendant, was attached to appear as a witness in the case at the March term, 1882, of the court, and was placed under bond. At the said March term the cause was continued by the State, but the witness Allen did not appear at said term, nor was his bond declared forfeited, nor was any other diligence used by defendant to compel his attendance until August, 1882, when defendant obtained another attachment to Harris county for this witness. This last attachment was returned not executed on the twenty-fourth day of September, 1882. This cause was not called for trial until the twenty-eighth day of September, 1882. No further efforts were made after the last attachment was returned, to compel the attendance of the witness, and no reason is shown why another attachment was not immediately forwarded to the sheriff of Harris county upon the return of *not executed* appearing upon the other. There was, we think, sufficient time, after the attachment was returned on the twenty-

fourth, to have sent another one, and to have had it executed in any part of Harris county, and have had the witness before the court by the twenty-eighth, the day on which the trial began. We think, therefore, that the diligence used to obtain the testimony of this witness, considering the facts, was insufficient, and that for this reason alone the court below might well refuse the application.    (*Fernandez* v. *The State,* 4 Texas Ct. App., 419; *Townsend* v. *The State,* 5 Texas Ct. App., 574; *Reynolds* v. *The State,* 7 Texas Ct. App., 576.)

But it is further shown by the State that there was present at the trial, within the knowledge of the defendant, a witness who had on a former trial of the case been placed on the stand by defendant to reproduce the testimony of the deceased witness Lee, and who had reproduced it fully. This witness was not called by defendant to testify, and no reason is shown why he was not again called to reproduce the testimony of Lee.   It is reasonable to suppose that, as he had reproduced it once he could reproduce it again.   Again, it was shown that throughout the trial defendant's counsel had in their possession a duly certified copy of the testimony of the deceased witness Lee, which had been given on a former trial of the case, and had been reduced to writing and filed in the office of the clerk of the Criminal District Court of Galveston county.   This was not offered in evidence by defendant, and no reason whatever was assigned why it was not offered. It would certainly, we think, have been admissible evidence, and if it contained the full evidence of the deceased witness Lee (and there was no pretense that it did not), then the defendant had in his possession on the trial all the evidence that he could have obtained from the witness Allen, had he been present. (Rev. Stats., Art. 2252.)

It is true that upon a first application for a continuance the defendant is not required to state in his application that the absent testimony cannot be procured from any other source, but when, upon an issue made upon the truth of the causes for new trial, it is shown, as in this case we think it was, that he could have procured the same testimony from other sources, which were at his command on this trial, and that he chose to not avail himself of such sources, we cannot see that he has been deprived of any legal right, nor that he has been injured by the refusal to grant his application a continuance.

In regard to the other cause for continuance, the absence of his leading counsel, such cause might under some circumstances

be sufficient to demand the continuance of a case.   But this case does not present such facts as would, we think, entitle defendant to a continuance for this reason, nor is it shown that he suffered any injury on account of the absence of his leading counsel. He was ably and faithfully represented on the trial of the case by other counsel, as the record abundantly attests.   (*Boothe* v. *The State*, 4 Texas Ct. App., 203.)

It is also urged that the motion for new trial should have been granted because the evidence is not sufficient to support the verdict.    We have carefully considered the evidence as presented in the statement of facts, and have no hesitancy in saying that it is sufficient to sustain the conviction.    There is positive testimony, from the lips of the murdered man in his dying moments, and in a moment after he received his death wound, that the defendant was the man who had killed him.    This statement of the deceased was strongly corroborated by well attested circumstances pointing to the defendant as the murderer.    It is unnecessary for us to detail these circumstances; but suffice it to say that in our judgment they are cogent, if not sufficient of themselves, to establish the guilt of the defendant.    It is judicially known to this court that the defendant has been tried for this offense three times before the juries of the country, upon this same evidence substantially, and has been three times found guilty of murder in the first degree.    It is also known to this court that throughout this prosecution he has been represented ably and faithfully by advocates distinguished for their great learning, eloquence and ability.

We are of the opinion that the defendant has had a most fair, impartial and complete trial—that every legal right has been fully accorded to him, and that his conviction is without error, and fully warranted by the law and the evidence; and we therefore in all things affirm the judgment.

*Affirmed.*

Opinion delivered February 21, 1883.


ON MOTION FOR REHEARING.


WILLSON, J.    After a careful consideration of the very able and ingenious arguments of the learned counsel made in support of defendant's motion for a rehearing, we are still of the opinion that this court has properly affirmed the judgment of conviction.

It is clear to our minds that the defendant's application for a continuance because of the absence of the witness Allen did not show sufficient diligence to obtain the testimony of that witness. A witness is understood to disobey a subpœna or an attachment when he is not in attendance upon the court on the day set apart for taking up the criminal docket, or any day subsequent thereto, and before the final disposition or continuance of the particular case in which he is a witness. (Code Crim. Proc., Art. 482.)

At the term of the court previous to the trial of this case the witness Allen, although under bond to appear as a witness in the case in behalf of the defendant, did not appear, and this fact was or should have been known to the defendant. It was then the right of the defendant to demand a forfeiture of the witness's bond, and to have an *alias* attachment for him. Failing to avail himself of this means furnished him by the law for enforcing the attendance of his witness, was a failure to use that diligence which the law required he should use. It was not incumbent upon the State to have the bond of the witness forfeited. It was the right of the State to demand the forfeiture, but the witness not being a State's witness, it was not obligatory upon the State to enforce his attendance. But, although the defendant neglected to have forfeited the bail bond of the witness, yet he obtained an *alias* attachment for him returnable on the twenty-seventh day of September, the case being set for trial on the next day, and which attachment was returned *not executed* because after diligent search and inquiry the witness could not be found, and this return is dated the twenty-fourth of September, at least three whole days before the day set for the trial. It is contended that it was not shown by the State that the attachment was actually returned into court on the twenty-fourth of September, or when it was actually returned into court, and further that it was not shown by the State that the witness Allen, from the twenty-fourth to the twenty-eighth of September, was in Harris county.

We know of no rule of law which requires the State to show a want of diligence in opposition to a continuance. It devolves upon the defendant to show, affirmatively and distinctly, that he has used all the diligence to obtain his witness required by law. If the attachment was not returned into court until after the twenty-fourth, he should have averred that fact, and also the time when it was returned. If the witness Allen was not in

Harris county, and could not have been reached by the process of the court in time to have him at the trial, it was incumbent upon the defendant, and not upon the State, to show such facts. Nothing is presumed in aid of an application for a continuance, but the burden is upon the party seeking a continuance to show himself entitled to it by definite, exact and certain averments. (*Cantu* v. *The State*, 1 Texas Ct. App., 402; *Murray* v. *The State*, Id., 417; *Buie* v. *The State*, Id. 452; *Bowen* v. *The State*, 3 Texas Ct. App., 617; *Robles* v. *The State*, 5 Texas Ct. App., 346.)

Again, at the term of the court at which the trial was had, the witness again being absent, it was the right of the defendant to have his bond forfeited, and to have an *alias* attachment for him on the day set apart for taking up the criminal docket, or on any day subsequent thereto. (Code Crim. Proc., Art. 482.) This was his right, notwithstanding an *alias* attachment had previously issued returnable on the twenty-seventh of September. It was no business of the witness that the cause had been set for trial on the twenty-eighth of September. He was no party to that action of the court, and, perhaps, had no knowledge of it. His duty as a witness was prescribed by law, and that was to be present on the day set for taking up the criminal docket, and, failing to be then present, it was the defendant's right and duty to have his bond forfeited, and to have *alias* process issued to enforce his attendance; and if these legal steps had been taken, the attendance of the witness would in all probability have been enforced. In addition to the want of diligence pointed out in the original opinion of this court, we have thought proper, in answer to the motion for rehearing, to call attention, also, to the foregoing, in order to show, as we think conclusively, that the application for continuance was, upon its face, insufficient, because it failed to show that the diligence required by law to obtain the witness Allen had been used. This failure to show diligence is of itself sufficient to sustain the ruling of the trial court in refusing the application.

But, as we have heretofore held, conceding that the diligence was sufficient, we are still of the opinion that the defendant's motion for a new trial was properly overruled. It is provided that "new trials, in cases of felony, shall be granted for the following causes, and for no other;" and among the causes specified there is but one which would embrace the causes set forth in the defendant's motion for a new trial, and that is as follows: "Where the court has misdirected the jury as to the law, or has

committed any other material error calculated to injure the
rights of the defendant." (Code Crim. Proc., Art. 672.) Was it
a material error calculated to injure the rights of the defendant
that the court refused his application for a continuance? Under
the facts of this case, as developed upon the trial of the motion
for a new trial, we cannot say that it was. It devolved upon
the defendant to show that the action of the court was calculated
to injure his rights; otherwise he showed no cause for a new
trial. It was proved that he had it within his power to repro-
duce the testimony of the deceased witness Lee, by another
witness present at the trial. He knew this, but chose to not
avail himself of it. It may be that the witness was not worthy
of credit. If so, it was incumbent upon the defendant to show
that fact, or some other reason why he did not make use of the
witness. He also had within his reach the written evidence of
Lee taken on a former trial of the case, and this he did not use
or offer to use. This written evidence may, or it may not, have
been admissible. In the opinion of this court rendered some
days ago it was said that we thought this evidence was admis-
sible. We made this statement under the belief that the evidence
was that taken before an examining court, or before a court
hearing the cause on *habeas corpus*, in either of which cases it
would, we think, be admissible. It is now argued by defendant's
counsel that this written evidence was embraced in a statement
of facts taken and prepared upon a former trial of the cause. If
this be so, there is some doubt in our minds as to its admissi-
bility, but we are by no means ready to say that it would not be
admissible for the purpose of reproducing the evidence of a de-
ceased witness. As this is a question which has never been
determined by this court, and one which would require consid-
erable investigation, and as it is not necessary to a disposition
of this case that we should now determine it, we decline to do
so. If the evidence was admissible, then it should have been
offered by the defendant. If it was inadmissible he was not
bound to attempt to avail himself of it. It is not shown by the
record definitely that the evidence was clearly admissible, and
this, we think, it devolved upon the State to show, and having
failed to show it, we do not think the failure to use or offer to
use the evidence should have any weight in considering the
merits of defendant's motion for a new trial; and in so far as
the opinion in this case considered it as having weight against
the motion, we think we committed an error, being led into this

error by the impression made upon our minds from the record that the written evidence was that taken before an examining court, or on trial upon *habeas corpus*. But, after discarding from the case this matter of the written evidence, the fact still remains that it was within the power of the defendant, by a witness then present, to reproduce the evidence of the dead witness Lee, and if he chose to speculate upon the chances of reversing a judgment of conviction in case he should be convicted, by the supposed error of the court in overruling his application for a continuance, he cannot be heard to complain that his rights have been injured; for, if injured, the injury has been the result of his own action, and cannot be imputed to the court.

As to the sufficiency of the verdict, we have heretofore said as much as is necessary to be said upon that subject. We have been much edified by the learned philological disquisition of defendant's counsel, endeavoring to convince us that *mrder* is not *idem sonans* with *murder*. While we admire the ingenuity of these arguments, we cannot concede their soundness when applied to the question discussed, and we have not been shaken in the deliberate conclusion we arrived at in the decision of the case, as to the sufficiency of the verdict. Motion for rehearing overruled.

*Rehearing refused.*

Opinion delivered March 21, 1883.